Markman, J.
Plaintiff appeals by leave granted from a March 28, 1996, opinion and order of the Worker’s Compensation Appellate Commission (wcac) determining the amount of “differential” benefits plaintiff is entitled to receive from the Second Injury Fund (SIF). We reverse in part and affirm in part.
On May 4, 1988, plaintiff injured his back in the course of his employment with General Motors Corporation (gm). At that time, plaintiff’s average weekly wage, exclusive of fringe benefits, was $843.95. In addition to that cash wage amount, plaintiff also had fringe benefits valued at twenty-five percent of his average weekly wage earnings, i.e., $210.98, which benefits were discontinued after his injury and disability.
*4 Gm paid plaintiff weekly worker’s compensation benefits in the amount of $397, the maximum weekly benefit allowed under MCL 418.355; MSA 17.237(355), which limits weekly benefits to ninety percent of the annually adjusted state average weekly wage determined by the Michigan Employment Security Commission. Specifically, MCL 418.355; MSA 17.237(355) provides, in pertinent part:
(1) The maximum weekly rate shall be adjusted once each year in accordance with the increase or decrease in the average weekly wage in covered employment, as determined by the Michigan employment security commission.
(2) Effective January 1, 1982, and each January 1 thereafter, the maximum weekly rate of compensation for injuries occurring within that year shall be established as 90% of the state average weekly wage as of the prior June 30, adjusted to the next higher multiple of $1.00.
The $397 weekly benefit rate paid by gm is based on ninety percent of the $440.77 state average weekly wage in 1988, the year in which plaintiff was injured. Because this weekly benefit rate exceeds two-thirds of the $440.77 state average weekly wage for 1988, the value of plaintiff’s discontinued fringe benefits was not included in gm’s calculation of plaintiff’s average weekly wage, pursuant to the two-thirds limitation of MCL 418.371(2); MSA 17.237(371)(2). Specifically, MCL 418.371(2); MSA 17.237(371)(2) provides, in pertinent part:
As used in this act, “average weekly wage” means the weekly wage earned by the employee at the time of the employee’s injury in all employment, inclusive of overtime, premium pay, and cost of living adjustment, and exclusive of any fringe or other benefits which continue during the disability. Any fringe or other benefit which does not con *5 tinue during the disability shall be included for proposes of determining an employee’s average weekly wage to the extent that the inclusion of the fringe or other benefit will not result in a weekly benefit amount which is greater than% of the state average weekly wage at the time of injury
In February of 1992, plaintiff settled his injury-related claims against an alleged third-party tortfeasor for $195,000. At that time, GM’s lien against any third-party recoveiy for reimbursement of previously paid worker’s compensation benefits already exceeded the $195,000 settlement amount. However, GM executed a release and agreed to accept $65,000 for any lien or claim that it had on plaintiff’s third-party recovery. In this manner, GM compromised its statutory lien on the entire third-party settlement amount, minus the costs of recoveiy, for less than half of the net recovery amount, leaving plaintiff with the remaining recovery proceeds.
After compromising its lien for reimbursement of worker’s compensation benefits previously paid, GM continued paying plaintiff benefits at the $397 weekly rate. A few months later, on June 8, 1992, the SIF began paying plaintiff “differential” benefits for “total and permanent disability” as defined by MCL 418.361(3); MSA 17.237(361)(3). A totally and permanently disabled employee is entitled to “basic” weekly compensation from the employer pursuant to MCL 418.351(1); MSA 17.237(351)(1) and differential benefits from the sif pursuant to MCL 418.521(2); MSA 17.237(521)(2). Differential benefits operate as inflation ad[justments payable by the sif and are calculated by subtracting the basic weekly benefit owed by the employer, based on the law in effect on the date of *6 injury, from the increased weekly benefit currently provided for the employee’s total and permanent disability. See, e.g., Jenkins v Great Lakes Steel Corp, 200 Mich App 202, 207-208; 503 NW2d 668 (1993).
Only two issues were presented for resolution by the magistrate in this case: (1) whether the two-thirds limitation of MCL 418.371(2); MSA 17.237(371)(2) applies when using the value of plaintiff’s discontinued fringe benefits to compute his average weekly wage for purposes of determining the amount of differential benefits to be paid by the sif, and (2) whether the sif is entitled to a credit against future payment of differential benefits based on the third-party recovery proceeds that plaintiff received after GM relinquished its statutory lien for only $65,000 of the settlement amount.
With regard to the first issue, the sif’s position is that the two-thirds limitation not only applies to the calculation of average weekly wage for purposes of determining the rate of basic benefits to be paid by the employer, but also to the determination of the differential benefits rate to be paid by the SIF. Specifically, the SIF maintains that the two-thirds limitation is applied when determining what the employee would be entitled to receive in basic weekly benefits if injured in the current year, before subtracting the amount of basic benefits the employee is entitled to receive from the employer based on the actual year in which the injury occurred. Therefore, according to the sif, the value of discontinued fringe benefits may not be included in calculating plaintiff’s average weekly wage for purposes of determining the amount of differential benefits based on the basic weekly benefit amount that plaintiff would receive if injured in *7 the current year, to the extent that adding the fringe benefits would result in a current basic weekly benefit rate that exceeds two-thirds of the state average weekly wage for the current year.
In contrast, it is plaintiffs position that the two-thirds limitation on the use of discontinued fringe benefits has no application at all when determining the amount of differential benefits to be paid by the SIF, but applies only to determining the amount of basic benefits to be paid by the employer based on the law in effect on the date of injury. Therefore, according to plaintiff, the rate of his differential benefits is calculated by subtracting the actual basic weekly benefit rate paid by gm, i.e., $397, from the basic weekly benefit rate plaintiff would be entitled to receive if injured in the current year based on an average weekly wage comprised of all cash wages and discontinued fringe benefits, without limitation, i.e., an average weekly wage of $1,054.93.[1]
The magistrate agreed with the SIF that the two-thirds limitation applies to the calculation of differential benefits payable by the SIF as well as the determination of basic benefits payable by the employer:
[Under MCL 418.371(2); MSA 17.237(371)(2)] an individual’s fringe benefits are only included in computing the average weekly wage under two conditions. First, the fringe benefits must be discontinued during the time of disability. Secondly, the individual’s rate must be less than two-thirds of the state average weekly wage at the time of the injury. If the rate is less, then the value of the discontinued fringe benefits will be added to the average weekly wage in order *8 to bring the injured employee’s compensation rate up to two-thirds of the state average weekly wage.
[T]he amount of differential benefits to be paid to the plaintiff is computed by using Sections 521(2) and 351(1). The compensation rate that the employer pays will remain the same as of the date of injury. In this case, General Motors will continue to pay $397.00 per week. The Fund’s liability can actually change from year to year particularly if applicable portions of the Act are amended. The Supreme Court in the case of Kidd v General Motors Corp, 414 Mich 578, 327 NW2d 265 (1982) specifically stated: “While the employer’s liability is established on the date of injury, the Fund’s liability fluctuates as applicable portions of the Act are amended but is always payable at the then current rate as set forth in the scheduled benefits.” Taking into consideration Section 351(1), the employer shall pay a weekly compensation rate of 80 percent of the employee’s after-tax weekly wage but never more than the maximum rate that is established under Section 355. The difference between the original compensation rate owed by the employer and the 80 percent of the employee’s after-tax average weekly wage, is the amount that is owed by the Second Injury Fund.
Since the plaintiff is receiving $397.00 per week based upon an average weekly wage of $843.95, the differential benefits owed by the Second Injury Fund are computed by subtracting General Motors’ compensation rate of $397.00 from the rate in the weekly benefit tables for the sum of $843.95, subject to the maximum rate, for each year subsequent to 1988. For example, the average weekly wage of $843.95 would yield a maximum rate of $409.00 in 1989. Thus, the Second Injury Fund would be responsible for paying the difference between $397.00 and $409.00. Perhaps at some point in the future, two-thirds of the state average weekly wage for a given year will be greater than 80 percent of the plaintiff’s average weekly wage. When that happens, then the time may exist that the plaintiff’s discontinued fringe benefits will be used to bring him up to two-thirds of the state average weekly wage. Until that time, *9 however, the plaintiffs current benefits and his differential benefits far exceed two-thirds of the state average weekly wage.
With regard to the second issue, the magistrate agreed with plaintiff that the sif is not entitled to any setoff or credit based on plaintiff’s receipt of third-party settlement proceeds because the amount of gm’s lien against the third-party settlement was large enough to consume the entire settlement amount, after deduction of the expenses of recovery, leaving no proceeds to be credited against any future benefit payments, even though GM actually only collected $65,000:
As previously stated, General Motors indicated that in April of 1991, their lien was $194,126.08. Given the fact that they have been paying the plaintiff $397.00 per week, as of the date of the settlement in February of 1992, General Motors would have paid far in excess of $195,000.00. As of that date, the Second Injury Fund had made no payments to the plaintiff for any total and permanent differential benefits. The only lien in existence as of February of 1992 was the lien of General Motors in excess of $195,000.00. In a release dated February 6, 1992, General Motors agreed to accept $65,000.00 and agreed to extinguish all liens or claims on any monies that the plaintiff received from this settlement. This essentially means that General Motors agreed to accept $65,000.00 in exchange for their lien of over $195,000.00. They also agreed to take no future credit from this settlement.
The Second Injury Fund contends that they are eligible to receive reimbursement based upon the monies that the plaintiff received as a result of the reduction of General Motors’ lien. Plaintiff contends that the Second Injury Fund is not eligible for reimbursement because their actions are derivative of the actions of General Motors.
In analyzing this particular issue, one must look at the Franges [v General Motors Corp, 404 Mich 590; 274 NW2d *10 392 (1979) ] formula. The plaintiff received from the third party settlement $195,000.00. The attorney fees and expenses were $68,572.96. This gave a Franges percentage of .35166. The next key element to the formula is the amount of compensation paid by General Motors. As I stated previously, as of April 2, 1991 they had paid $194,126.08. As of the date of the third party settlement, this amount would have increased substantially and certainly exceeded $195,000.00. Just in using the figure of $195,000.00, this would mean that General Motors would be entitled to the entire amount of the money that the plaintiff received less the attorney fees and expenses. However, General Motors made an agreement with the plaintiff to accept $65,000.00 of the settlement rather than the entire amount. In computing future credit, the entire amount of the General Motors lien which was approximately $143,000.00 would be subtracted from the total settlement. In executing this subtraction, there would be absolutely no future credit that General Motors could use. I believe that one does not subtract the amount of the settlement that General Motors received of $65,000.00 but rather their entire lien is subtracted. I believe that when one examines the Franges formula, this is the only result that can be reached.
Numerous cases have held that the Second Injury Fund is entitled to reimbursement for monies that they paid and to future credit. Grogan v Manistique Papers, Inc, 154 Mich App 454 [397 NW2d 825] (1986). However, in this case, there is no future credit from the settlement benefits.
[T]he Second Injury Fund is not entitled to future credit on the third party settlement that the plaintiff received in February of 1992. General Motors and the plaintiff entered into a contract to extinguish General Motor’s Lien. I specifically find that the General Motors lien of roughly $143,000.00 was compromised for $65,000.00. Such compromises are encouraged in order for the parties to reach a settlement in a third party lawsuit. However, the entire amount of the lien must be subtracted from the total settle- *11 merit to figure any future credit. Given the amount of the lien plus the attorney fees, there is no future credit from which the Second Injury Fund can seek reimbursement or credit.
Both plaintiff and the sif appealed the magistrate’s decision to the wcac, plaintiff challenging the magistrate’s decision on the issue concerning the use of plaintiffs discontinued fringe benefits to calculate the differential benefit rate, and the sif challenging the magistrate’s decision on the issue concerning the use of plaintiff’s third-party settlement recovery as a credit against the SlF’s future liability for payment of differential benefits. The wcac unanimously affirmed the magistrate’s ruling on the fringe benefits issue. However, a 2 to 1 majority of the WCAC panel reversed the magistrate’s decision on the issue of the SlF’s entitlement to a credit based on the proceeds plaintiff received from the third-party settlement, concluding that disallowing a credit would be contrary to the intended purpose of MCL 418.827(5); MSA 17.237(827)(5) to eliminate double recoveries:
The courts have long recognized the legislative intent of that section to ensure reimbursement of workers’ compensation benefits which are paid to an employee from third party tort recoveries, and thereby avoiding double recovery. Gamble v American Asbestos Products Co, 381 Mich 105 [159 NW2d 839] (1968). The right to reimbursement created by Section 827(5) extends to the Second Injury Fund. Grogan, supra.
As noted above, Section 827(5) specifically allows the insurer to receive reimbursement for any monies it had previously paid or which are payable. Thus, the Second Injury Fund is entitled to participate in (or in this case receive credit for) the distribution of funds from the third party tort settlement, at least to the extent that it continues to pay benefits in the future.
*12 We do not agree with the magistrate’s decision to include sums beyond the $65,000.00 defendant General Motors actually received from the third party tort settlement, thus artificially decreasing the amount available to other insurers to zero dollars. That General Motors decided to accept less than the amount it may have recovered from that settlement was a part of a private agreement between General Motors and plaintiff. To allow such a private agreement between two of the parties to prevent an insurer from exercising its right to reimbursement under Section 827(5) is repugnant to the Act and generally established judicial principals [sic]. The act clearly mandates that third party recoveries are to be dispersed to the carriers who pay or will pay benefits, after recovery of expenses.
In this case, both the Second Injury Fund and General Motors initially had the potential right to recover sums from the third party settlement. It is true that had General Motors chosen to exercise the entirety of its lien, there would have been no sums left to credit against future payments, either its own or those of the Second Injury Fund. However, General Motors chose to voluntarily, for whatever (irrelevant) reason, relinquish its lien to the remaining sums.
Logically, once it did so, it could not then dictate that those monies are to go to plaintiff. It no longer had any claim or right to those sums. The sums remain for any other carriers or insurers, as envisioned by Section 827(5), which have a claim to the monies, either for benefits already paid or payable in the future. One defendant (such as General Motors here) and the plaintiff cannot decide that those excess sums are not available to other defendants without their consent.
Further, the holding by the magistrate flies in the face of the long recognized prohibition against double recovery by the employee in third party tort recoveries:
*13 To summarize, we hold that as General Motors chose to voluntarily relinquish a portion of its lien as the right to reimbursement to any sums beyond $65,000, the remaining post-attorney fee sums in the third party recovery remain available for reimbursement purposes using the so-called Franges formula. Franges v General Motors, 404 Mich 590 (1979). General Motors relinquished a portion of its lien. It cannot do so and then dictate where the remaining monies will go. That portion of the magistrate’s opinion which holds otherwise is reversed. The Second Injury Fund is entitled to receive credit from the remaining third party recovery balance against future payments.
On appeal, our review of the wcac’s decision is limited to questions of law. Findings of fact made or adopted by the WCAC within the scope of its powers are conclusive on appeal if there is any competent evidence in the record to support them, but a decision of the WCAC is subject to reversal if it is based on erroneous legal reasoning or the wrong legal framework. Goff v Bil-Mar Foods, Inc (After Remand), 454 Mich 507, 512; 563 NW2d 214 (1997); Bates v Mercier, 224 Mich App 122, 124; 568 NW2d 362 (1997). Although statutory interpretation is a question of law, this Court ordinarily will accord considerable deference to the construction placed on statutory provisions by an agency charged with enforcing them—at least where the agency interpretation is not clearly wrong. Jones-Jennings v Hutzel Hosp (On Remand), 223 Mich App 94, 105; 565 NW2d 680 (1997).
With regard to the fringe benefits issue, we find no error in the wcac’s application of the two-thirds limitation of MCL 418.371(2); MSA 17.237(371)(2) when determining the amount of differential benefits to be paid for total and permanent disabilities. As plaintiff correctly notes, differential benefits are intended as a *14 special supplement for totally and permanently injured workers, providing totally disabled individuals the benefit of annual increases in the maximum allowable weekly benefit rate. Specifically, MCL 418.521(2); MSA 17.237(521)(2) provides, in pertinent part:
Any permanently and totally disabled person as defined in this act, if such total and permanent disability arose out of and in the course of his employment, who, on and after June 25, 1955, is entitled to receive payments of workmen’s compensation in amounts per week of less than is presently provided in the workmen’s compensation schedule of benefits for permanent and total disability, and for a lesser number of weeks than the duration of such permanent and total disability, after the effective date of any amendatory act by which his disability is defined as permanent and total disability, or by which the weekly benefits for permanent and total disability are increased, shall receive weekly from the carrier on behalf of the second injury fund differential benefits equal to the difference between what he is now or shall hereafter be entitled to receive from his employer under the provisions of this act as the same was in effect at the time of his injury, and the amounts now provided for his permanent and total disability by this or any other amendatory act, with appropriate application of the provisions of sections 351 to 359.
We find the wcac’s application of the two-thirds limitation entirely consistent with the remedial intent of this statute. The wcac’s reasoning allows totally and permanently disabled workers to receive the very same benefit amount that they would be entitled to receive if injured in the current year, i.e., “the amounts now provided for . . . total and permanent disability,” thereby fully providing them with the benefit of any rate increases that occur after their date of injury. This is because a totally and permanently dis *15 abled worker injured in the current year would be entitled to receive only basic benefits, calculated according to the law in effect at that time, subject to the two-thirds limitation of MCL 418.371(2); MSA 17.237(371)(2). In contrast, plaintiffs proposed reasoning, precluding any application of the two-thirds limitation of MCL 418.371(2); MSA 17.237(371)(2) in the calculation of differential benefits, would have the absurd and inequitable result of allowing totally and permanently disabled workers injured in previous years to receive greater benefits than those which similarly situated totally and permanently disabled workers injured in the current year would be entitled to receive.
Plaintiff draws our attention to the fact that the phrase “weekly benefit” used in MCL 418.371(2); MSA 17.237(371)(2) and other parts of the Worker’s Disability Compensation Act has been interpreted as referring only to the basic benefits paid by the employer, and not including any differential benefits paid by the sif. See Kincaid v Detroit Mut Ins Co, 431 Mich 426, 440, n 11; 429 NW2d 595 (1988). However, we do not believe this point provides any real support for plaintiff’s claim that the two-thirds limitation of MCL 418.371(2); MSA 17.237(371)(2) does not apply to the calculation of differential benefits.
One of the intermediary steps in calculating differential benefits is to calculate what the totally and permanently disabled worker would be entitled to receive if injured in the current year, i.e., the “weekly benefit amount” in basic benefits “now provided for” in the current year. Jenkins, supra. To determine the amount the worker would be entitled to receive if injured in the current year, the current benefit rate *16 schedules and provisions must be applied to the worker’s average weekly wage. It is at this hypothetical basic rate determination step that MCL 418.371(2); MSA 17.237(371)(2) applies to exclude discontinued fringe benefits from the average weekly wage calculation if the resulting hypothetical basic rate for the current year would exceed two-thirds of the current state average weekly wage. Thus, even under the WCAC’s interpretation of MCL 418.371(2); MSA 17.237(371)(2), the words “weekly benefit” are appropriately applied to the hypothetical basic benefit rate for the current year. Accordingly, we do not find the WCAC’s reasoning in this case inconsistent with the interpretation of “weekly benefits” in Kincaid, supra. We find the WCAC’s interpretation of the law to be altogether reasonable and, therefore, entitled to deference. Jones-Jennings, supra.
However, with regard to the third-party recovery issue, we agree with plaintiff that the WCAC erred in concluding that MCL 418.827(5); MSA 17.237(827)(5) entitles the sif to treat the third-party settlement proceeds relinquished by GM as a credit against future payments of differential benefits. MCL 418.827(5); MSA 17.237(827)(5) grants employers and carriers (including the sif) a lien on any third-party recovery for the same injury for which worker’s compensation benefits have been paid. After deducting expenses of recovery, the lien is to be applied first to reimburse any compensation paid or payable on or before the date of the third-party recovery, with any balance remaining after that reimbursement going to the employee or the employee’s dependents or personal representative, subject to a credit against any future *17 payments of compensation. Specifically, the statute provides in pertinent part:
Any recovery against the third party for damages resulting from personal injuries or death only, after deducting expenses of recovery, shall first reimburse the employer or carrier for any amounts paid or payable under this act to date of recovery and the balance shall immediately be paid to the employee or his or her dependents or personal representative and shall be treated as an advance payment by the employer on account of any future payments of compensation benefits.
Here, the amount of the third-party recovery remaining after deduction of the expenses of recovery was not large enough to fully reimburse the compensation paid or payable on or before the date of recovery, much less to provide any remaining balance to be treated as an advance payment of future compensation benefits. Although GM relinquished its lien for only $65,000, this neither enhanced nor diminished the sif’s entitlement to a setoff or credit against future payments of differential benefits. Contrary to the sif’s argument, MCL 418.827(5); MSA 17.237(827)(5) does not provide a credit whenever the plaintiff obtains the proceeds of a third-party settlement under any circumstance, but only in the event that a balance remains after first reimbursing all of the compensation paid or payable to the date of recovery. What plaintiff received as a result of GM’s release of its lien was not the kind of postreimbursement “balance” that MCL 418.827(5); MSA 17.237(827)(5) contemplates using as a credit against future payments. Rather, the funds that plaintiff received constituted the consideration arising under what the wcac correctly recog *18 nized as a private settlement agreement between plaintiff and gm.
Contrary to the wcac’s determination, the settlement agreement between plaintiff and GM does not operate “to prevent an insurer from exercising its right to reimbursement under Section 827(5).” As the wcac acknowledged in a footnote, the sif does not claim any entitlement to reimbursement for differential benefits paid retroactively for periods before the date of the third-party settlement in February of 1992, but only a credit against future benefits paid or payable after the date of recovery.[2] Because MCL 418.827(5); MSA 17.237(827)(5) first requires full reimbursement of compensation paid or payable on or before the date of recovery as a condition precedent to allowing any credit for future payments, and because the amount of the third-party recovery in this case is undisputedly insufficient to provide such full reimbursement, it follows that the sif never had, and therefore was not deprived of, any entitlement to a credit under MCL 418.827(5); MSA 17.237(827)(5) based on plaintiff’s third-party recovery. It is not accurate to say that GM’s settlement artificially decreased the amount available to the SIF for a credit under MCL 418.827(5); MSA 17.237(827)(5). To the contrary, it is the decision of the wcac, in our judgment, that has the effect of artificially increasing the amount of third-party recovery available to the sif for a credit.
*19 We recognize that there is a well-established policy in this state, reflected in MCL 418.827(5); MSA 17.237(827)(5), against double recoveries in worker’s compensation cases, Thick v Lapeer Metal Products, 419 Mich 342, 347; 353 NW2d 464 (1984); Stanley v Hinchcliffe & Kenner, 395 Mich 645, 657; 238 NW2d 13 (1976), although there is nothing in the statute that specifically addresses the instant situation. At the same time, this state also has a very strong policy in favor of settlements. Jackson v Barton Malow Co, 131 Mich App 719, 722; 346 NW2d 591 (1984), aff’d sub nom Rittenhouse v Erhart, 424 Mich 166; 380 NW2d 440 (1985). That policy is reflected, for example, in MCL 418.827(2); MSA 17.237(827)(2), which provides for the claims of an employer or carrier arising out of the liability of a third party to be resolved through settlement and release. Accordingly, we do not believe that the general policy against double recovery inexorably trumps the general policy in favor of encouraging settlements, or otherwise leads to the conclusion that an employer or carrier is prohibited from settling and relinquishing its right to reimbursement from a third-party recovery.[3]
Any double recovery here by plaintiff is solely and necessarily the result of gm’s voluntary compromise of its hen for reimbursement under MCL 418.827(5); MSA 17.237(827)(5), not continued payment of differential benefits by the SIF for periods after the third-party recovery in February of 1992. Specifically, plain *20 tiffs double recovery is his receipt of both the compensation previously paid by GM through the date of the third-party recovery and a portion of the third-party recovery that MCL 418.827(5); MSA 17.237(827)(5) earmarks for reimbursement of that previously paid compensation. The sip’s payment of differential benefits for periods after the third-party recovery does not increase plaintiff’s double recovery, just as granting the sif a credit against future benefits does not eliminate or decease plaintiff’s double recovery but merely creates an offsetting period of under-recovery. Therefore, even if we were persuaded that gm’s compromise of its lien for reimbursement were somehow contrary to MCL 418.827(5); MSA 17.237(827)(5), the appropriate remedy would be to eliminate the resulting double recovery for the period of disability through the date of the third-party recovery, not to relieve the SIF of its obligation to pay differential benefits for subsequent periods of disability on the basis of a credit or setoff the sif would not have had if the provisions of MCL 418.827(5); MSA 17.237(827)(5) had been followed.
The case of Piper v Pettibone Corp, 450 Mich 565; 542 NW2d 269 (1995), cited by the wcac, is inapposite, because the employer in that case did not voluntarily agree to compromise its worker’s compensation lien in connection with the employee’s settlement of the underlying third-party lawsuit. Moreover, we again note that even if we were to apply the reasoning of the Piper decision in this case, we would be obliged to strictly enforce the provisions of MCL 418.827(5); MSA 17.237(827)(5) as written by requiring that the third-party recovery proceeds relinquished by GM be used not for a credit against future payments by the *21 SIF, but first for reimbursement of the benefits paid or payable through the date of recovery that have not already been reimbursed.
The order of the wcac is reversed in part, to the extent that it allows the SIF to treat the proceeds from plaintiffs third-party settlement recovery that GM relinquished to plaintiff as a credit against future benefit payments, but in all other respects, the order of the wcac is affirmed.

 For 1997, the $1,054.93 average weekly wage would result in a weekly benefit amount of $533, the maximum weekly benefit under MCL 418.355; MSA 17.237(355).

 Accordingly, we do not address in this case any issue of the SlF’s entitlement to a share of the third-party proceeds available for reimbursement of benefits previously paid or payable. Cf. Noyd v Celotex Corp, 1989 Mich ACO 470.

 We have not been presented here with information regarding gm’s reasons for compromising its lien for reimbursement in this case. We express no opinion concerning whether an employer’s or carrier’s settlement of a lien for reimbursement may be challenged where there is some showing that it was negotiated in bad faith or to the detriment of the rights of the sir.